Abraham N. (teller, J.
This action, tried by the court without a jury, is for breach of agreement confirmed in a letter signed by defendant agreeing to pay plaintiff ‘£ $35,000 or seven per cent (7%), whichever is lower, I or my companies receive ” from the closing of a certain transaction. The only issue in the case is defendant’s affirmative defense that the execution of this letter was obtained by economic coercion and duress ££ in that said plaintiff threatened that unless defendant signed said agreement, he would renege on a prior agreement and upset an impending sale of a valuable property.”
Defendant also argues that the letter-agreement is susceptible of an interpretation, when taken in conjunction with the testimony of the conversations of the parties, that defendant agreed therein to pay 7% of the profits realized from the closing, which would mean a payment to plaintiff of only $6,000 instead of the $35,000 claimed. But the letter plainly refers to the moneys received from the closing and not the profits realized.
Defendant can avoid the effect of the letter-agreement only by his defense based on the doctrine of business compulsion. Since that defense in avoidance of a definite contractual obligation is in no event sustainable unless there is a primary finding that the plaintiff has by reason of his position taken an undue advantage of defendant’s business necessities and forced him to submit to an extortionate claim, the pertinent facts of the parties’ business relationship must be analyzed with this principle in mind. If the evidence shows that no undue advantage was taken by plaintiff, there would be no need to inquire further into the question as to whether some form of threat or coercion was exercised to procure defendant’s signature.
Plaintiff is the inventor of a method of insulating wire. He and a group of individuals formed a corporation to exploit the invention. In 1956 a contract was entered into between plain *463 tiff, his corporation, and Adam Consolidated Industries, Inc. (hereinafter Adam). Defendant was and is president and chairman of the board of Adam. He is also president and chairman of the board of a number of corporations, one of which is listed on the American Stock Exchange.
The contract provided for the transfer of plaintiff’s patents and all of his corporation’s assets to Adam, and plaintiff was employed at a modest salary. Plaintiff was additionally to receive 25% of the net operating profit derived from the manufacture and sale of the insulated wire until the sum of $50,000 was paid, and thereafter 10% of the difference between net selling price and cost of production. It was also agreed therein that if Adam sold all rights under the contract, 10% of the “ proceeds of sale ” was to be paid to plaintiff.
By 1960 defendant’s companies had invested in the venture a total of about $433,500. No profits had as yet been made and plaintiff had been receiving only his salary.
In the Summer of 1960 defendant advised plaintiff of a plan by which additional capital could be obtained by means of a public offering of securities through an underwriter. There were tentative discussions as to changes in their 1956 agreement under such a setup. But, about this time, Techno Fund, Inc. (hereinafter Techno), licensed as a small business investment company, became interested in an outright purchase of the assets and invention. The subject of a public offering was thereupon dropped, and the discussions as to the revised arrangements to be agreed upon under that type of reorganization were discontinued.
Techno insisted that all rights under the 1956 agreement be released, so that there would be no obligation on its part to pay plaintiff any part of the profits of the business or any part of the proceeds of sale of the patent rights, if it later determined to dispose of these. It also conditioned its purchase upon the continuance of plaintiff’s services, and defendant urged plaintiff to work out a satisfactory arrangement with Techno so that the deal would go through. While these negotiations were being-conducted, plaintiff and his attorney had discussions with defendant with regard to additional payment to be made by Adam, defendant or his companies in consideration of plaintiff releasing all rights under the 1956 agreement as required by Techno.
The sale was finally consummated. Adam received $525,441.21, which represented a profit of $92,000 over its investment. In addition, $83,738.25 in liabilities of the venture was assumed by the purchaser. Plaintiff was made president of the oper *464 a ting company, and was given some debentures and stock having a total value of $26,272 as well as a contract of employment.
He released all rights under the 1956 agreement by an instrument which he delivered to defendant conditioned upon defendant’s signed agreement pursuant to oral understanding to pay an additional sum not to exceed $35,000. This release was, of course, needed by defendant to close the deal.
Before reviewing the respective contentions of the parties as to what was agreed to in these conversations — the nub of the dispute — it is important to keep in mind what plaintiff was giving up under the 1956 agreement and how both parties fared in the Techno deal. The question to be answered is whether the facts indicate that plaintiff was taking undue advantage or making an extortionate claim in insisting that he receive $35,000 from defendant or his companies (it was defendant who, for reasons of his own, made it a personal obligation) for his release of all rights under the 1956 agreement, in addition to the $26,272 he was receiving from the purchaser.
Plaintiff gave up the right to receive 25% of net operating-profits up to $50,000, plus roughly 10% thereafter. The sum of $26,272 received by plaintiff from the purchaser represents only partial consideration for release of this provision. Plaintiff also gave up the right to receive 10% of the “ proceeds of sale ” from Adam, defendant’s company, which would have amounted to $61,000 on the basis of the total consideration received by Adam (or its subsidiary)., including purchaser’s assumption of $83,738.25 in liabilities, or $52,500 on the basis of the total sum actually received. Whatever view one takes of these financial arrangements, the $35,000 payment agreed to be made by defendant is obviously not an extortionate amount.
Moreover, defendant’s company realized a profit of $92,000 with respect to a venture which had apparently turned into a bad investment and a possible capital loss. Payment of the $35,000 herein sued for would merely reduce its profit to $57,000. Since plaintiff, if successful in this action, will have received a total of about $61,000 from the sale, his net profit above his investment would be considerably less than $57,000. Taking the facts as the figures reveal them, it is evident that plaintiff’s claim is within a bargaining range which, on its face, belies defendant’s contention of duress to avoid the legal effect of his execution of the letter-agreement. As a matter of fact, even if we should assume that plaintiff pressed a hard bargain in settling his claims under the 1956 agreement, this would not in itself constitute duress.
*465 Plaintiff’s version of his negotiations with defendant is simple and direct. It is corroborated by the testimony of the attorney representing him in that transaction and confirmed by the only writing on the subject. He states that he told defendant that, as defendant was recouping his investment and since he was giving up any chance of obtaining the $50,000 earnable under the 1956 agreement, he wanted to receive from defendant or his companies at least a sum representing the investment in cash expended and services rendered in connection with his invention, which he estimated at about $35,000. He testified that defendant assured him that he would take care of it and urged him to co-operate with Techno to consummate the deal. His attorney called defendant.and obtained confirmation of the arrangement.
The attorney then prepared a letter-agreement to be signed by defendant confirming the oral understanding, together with a release executed by plaintiff of all of plaintiff’s rights under the 1956 agreement. Plaintiff delivered both papers, defendant not being available, to Mr. Saik, an officer of Adam, who was also house counsel for defendant’s business affairs, with instructions not to deliver the release to Techno until defendant had signed the confirmation letter. The Techno closing was postponed. Plaintiff called defendant, expressing concern over the delay in defendant’s delivery of the signed agreement, and was told not to worry. A day or so later Mr. Saik called plaintiff to tell him that defendant would take care of the signing of the agreement for his $35,000. About two weeks later, prior to the time of the actual closing, defendant called plaintiff to come to his office and delivered to him not the draft prepared by his attorney, but a letter containing several changes in wording made by defendant. The formula — “ $35,000 or 7%, whichever is lower, I or my companies receive from the closing of that transaction” — was employed because the closing had not yet taken place and the precise amount of the sales price was not established. The original percentage in plaintiff’s draft had been 9% on the assumption that the sales price would be about $400,000, and this had been changed to 7% when defendant stated that it would be in the neighborhood of $500,000. Plaintiff spoke to Mr. Saik after the closing and was told that defendant would take care of the matter on his return from out-of-town. But, instead of paying the $35,000, defendant claimed coercion and duress.
Defendant’s version is, of course, markedly different with respect to the conversations. He testified that he told plaintiff' that his demand for $35,000 was absurd, that everything had *466 to come out of profits. He claims to have convinced plaintiff’s attorney some time after receipt of the draft to prevail upon his client to accept defendant’s offer, and that plaintiff finally agreed over the phone to accept 7% of any profits made on the transaction. Defendant testified that just prior to the closing plaintiff threatened to renege on this alleged oral agreement and that he signed the letter-agreement providing for $35,000 or 7% of the sum received on the sale, whichever was lower, to avoid the sale being upset.
Defendant’s contention is purportedly based on the doctrine of economic duress or business compulsion, recognized in such cases as: United States v. Bethlehem Steel Corp. (315 U. S. 289); Aronoff v. Levine (232 N. Y. 529); Hornstein v. Paramount Pictures (22 Misc 2d 996, affd. 266 App. Div. 659, affd. 292 N. Y. 468); Wou v. Galbreath-Ruffin Realty Co. (22 Misc 2d 463). Under this doctrine the courts will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury. But it is important to keep in mind a rule' of law and reason — that it does not constitute duress to do what one has the legal right to do (McPherson v. Cox, 86 N. Y. 472; Dunham v. Griswold, 100 N. Y. 224).
Defendant takes the position that the oral agreement which he says plaintiff finally made over the telephone for 7% of the profits was based upon consideration and was a binding contract ; that plaintiff breached said agreement when he insisted several days later upon defendant signing the letter-agreement; and that defendant was coerced into signing it because the legal remedy of damages available to him for plaintiff’s breach was meaningless in light of the business necessity to him of the impending transaction.
It is quite clear, however, that defendant’s reliance upon the doctrine is wholly unfounded as a matter of law and fact and, indeed, common sense.
Analysis of the financial arrangements reveals no possible basis for a finding of undue advantage, extortion or unlawful injury. Viewed as a whole the negotiations between the parties constituted the usual bargaining embraced in settling a related or subsidiary claim, whose disposition is required to consummate a closing. Plaintiff had a legal claim under the 1956 agreement to a substantial sum arising upon a sale by Adam. So long as the settlement of his rights is for an amount within the reasonable limits of his claim, economic duress cannot be urged after the closing to bar recovery of the agreed amount.
*467 Defendant’s argument is based upon the proposition that the alleged oral agreement for 7% of the profits constituted a binding contract supported by consideration. Actually, its introduction into the case through the wholly unsupported testimony of defendant is inconsistent with and contradicted by all of the other evidence in the case and the practicalities of the situation. Whether consideration may be claimed here on the ground of termination of a contract and an agreement to settle an outstanding claim is beside the point. There was no change of position on the part of defendant as the result thereof, which would involve prejudice to him arising from plaintiff’s alleged breach in subsequently insisting on his original offer.
Factually, defendant’s position is entirely untenable. He relies solely on his own testimony concerning a telephone call. Although he still continued to keep the draft prepared by plaintiff’s attorney delivered more than two weeks before this alleged call, there was no confirmatory note or letter written by him of the new arrangement claimed to have been agreed to by plaintiff. The testimony of plaintiff’s attorney, as well as of plaintiff, directly contradicts defendant’s version. They have flatly stated that no such discussion even took place.
It should also be noted that the “ 7 ”% figure in the context of the sales price has meaning with relation to plaintiff’s proposal to accept $35,000, while in the context of profits — unkown and, in fact, uncertain at the time — it has no meaning and would appear to be the product of wishful thinking rather than actual agreement.
The defense of economic duress under these circumstances does not accord with the parties’ relative positions. Defendant, in contrast to the plaintiff, is a man of important business affairs and experience, with house counsel available at his office. Surprisingly, he states that he did not consult counsel with reference to this settlement, though he received the draft from his house counsel and personally made several changes in it before having his secretary retype it for his signature. This circumstance alone would appear to be inconsistent with his claim. Moreover, despite the several important references in the testimony to Mr. Saik’s statements to plaintiff supporting the latter’s version and despite Mr. Saik’s attendance in the courtroom for the first two days of trial, he was not produced as a witness on behalf of defendant.
Finally, if the defense of economic duress were to be sustained under circumstances such as these, a signed written agreement would be of little value. Business transactions involving bargaining situations, as is so often the case, would *468 be in a confused and chaotic state. The equitable doctrine of economic duress requires a showing of special circumstances to warrant the interposition of a court to prevent an injustice, not to do one.
Judgment is accordingly directed to be entered in favor of plaintiff and against the defendant for the sum of $35,000, with interest from November 16, 1960.