The FIRST NATIONAL BANK OF CINCINNATI, Plaintiff,

v.

Sidney PEPPER, Defendant-Appellee,

Elsie W. COX et al., Defendants-Cross-Claimants-Appellants,

Modern Talking Picture Service, Inc., et al., Defendants.

Nos. 172, 173, Dockets 71–1449, 71–1469.

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1971.

Decided Jan. 3, 1972.

As Amended March 14, 1972.

**628**

Preben Jensen, New York City (Casey, Lane & Mittendorf, David H. Kohl, New York City, on the brief), for defendants-cross-claimants-appellants.

Ben A. Matthews, New York City (Harper & Matthews, Harold Harper, Vincent P. Uihlein, New York City, on the brief), for defendant-appellee.

Before MEDINA, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

This is a statutory interpleader action pursuant to 28 U.S.C. § 1335 [1] original-

---

1. 28 U.S.C. § 1335 provides in pertinent part that:

"(a) The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association, or society having in his or its custody or possession money or property of the value of $500 or more, . . . if

"(1) Two or more adverse claimants, of diverse citizenship as defined in section 1332 of this title, are claiming or may claim to be entitled to such money or property, or to any one or more of the benefits arising by virtue of any note, bond, certificate, policy or other instrument, or arising by virtue of any such obligation; and if (2) the plaintiff has deposited such money or property or has paid the amount of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court, there to abide the judgment of the court, . . . . "

ly instituted in the District Court for the Southern District of Ohio by the First National Bank of Cincinnati to settle conflicting claims to a fund of $75,-000 held by the bank. The fund has been paid into court, the bank discharged, and the action transferred to the District Court for the Southern District of New York, which is a more convenient forum for the claimants.

The adverse claimants to the fund are, on the one hand, Sidney Pepper ("Pepper"), a New York attorney, and, on the other, eight former stockholders ("stockholders") of Modern Talking Picture Service, Inc. ("Modern"), a closely held corporation.[2] The stockholders appeal from an order of the district court granting summary judgment in favor of Pepper and dismissing three cross-claims asserted by them. For the reasons stated below we reverse.

Pepper, as the party moving for summary judgment, "had the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material [he] lodged must be viewed in the light most favorable to the opposing party." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); see also Shinabarger v. United Aircraft Corp., 381 F.2d 808, 810 (2d Cir. 1967). Furthermore, when the factual allegations in the pleadings of the party opposing summary judgment are supported by affidavits or other evidentiary material, they must be taken as true in ruling on the motion. See 3 Barron & Holtzoff, Federal Practice and Procedure § 1235, at 140–41 (Wright ed. 1958); Furton v. City of Menasha, 149 F.2d 945, 947 (7th Cir.), cert. denied, 326 U.S. 771, 66 S.Ct. 176, 90 L.Ed. 466 (1945).

Applying these standards, the facts as we must assume them for the pur-

poses of this appeal appear to be as follows. The dispute between the parties arose out of a series of machinations in connection with the sale of the stock of Modern. Some time in the first few months of 1968 Pepper, who was general counsel of Modern at a yearly retainer of $12,000, negotiated with Sonderling Broadcasting Company ("Sonderling") for the sale to it of the assets and/or stock of Modern. On April 8, 1968, Modern's Board of Directors approved the sale of Modern to Sonderling for $2,-800,000 and provided for payment of a $300,000 finder's fee in connection therewith to the Commonwealth Development Corporation. After this meeting it was discovered by the Board that Sonderling had sent a letter to the Board on March 20, 1968, outlining the terms of the offer, which Pepper had withheld from it. The Board also found out that Pepper had failed to keep it currently informed of an offer by a group headed by Sherman Unger of Cincinnati, Ohio ("Unger") to buy Modern's stock and had failed to inform Unger of the Sonderling offer in order to give him the opportunity to better it.

On May 13, 1968, Richard M. Hough, a minority shareholder in Modern and a claimant herein, brought suit in the Delaware Chancery Court for New Castle County (Modern being a Delaware corporation) to enjoin the sale of Modern to Sonderling. At a hearing on the motion for a preliminary injunction, Pepper admitted under oath that he had failed to show the Sonderling letter of March 20 to the Board and disclosed that he was to receive one-third of the $300,000 finder's fee authorized by the Board to be paid to the Commonwealth Development Corporation. He also disclosed that his wife had a substantial financial interest in Sonderling.[3] It is not surprising to find that upon the testimony at the

---

2. Two stockholder-claimants, Alexandria MacCallum Walcott and William H. MacCallum, have settled with Pepper and their portion of the fund has been released to him, leaving a balance of $61,-753.95 on deposit.

3. Her interest in Sonderling dated from April, 1968 when the stock of Modern Teleservice, Inc., a companion company to Modern Talking Service, Inc., was exchanged for that of Sonderling in connection with the acquisition by Sonder-

hearing the Chancellor preliminarily enjoined the sale of Modern to Sonderling.

Advised of these disclosures Mrs. Rosalie M. Arlinghaus ("Mrs. Arlinghaus"), who controlled a majority of Modern's stock, dismissed Pepper as her counsel on May 22, 1968. Two days later Modern's Board of Directors rescinded their resolution approving the sale of the corporation to Sonderling and dismissed Pepper as its general counsel.

Meanwhile, the Board of Modern had received a firm purchase offer from Unger. The terms of the offer specified that it had to be acted upon by May 24;[4] all stockholders of Modern agreed to the sale. Pepper, however, immediately threatened to use his strategic position as the custodian of certain essential records to prevent the consummation of the sale unless he was first paid money to which he was not entitled.

As general counsel for Modern and counsel for several of its stockholders, Pepper had in his possession certain papers of Modern which had to be surrendered to Unger at the closing, including Modern's minute book, stock certificate book, by-laws, and stock certificates owned by the Arlinghaus group. On May 21 the Secretary-Treasurer of Modern and, on May 22 both the Secretary-Treasurer and Mrs. Arlinghaus, requested Pepper at his law office to surrender these crucial materials. Pepper refused, asserting that he had the right to retain the materials under a common law attorney's retaining lien[5] until he was paid $100,000 legal fees plus $10,000 expenses he alleged were owed him by Modern and several of its stockholders in connection with the aborted Sonderling deal. The stockholders and Modern denied any legal fees were due Pepper in this regard. Confronted with Pepper's refusal to turn over their records, they obtained an extension of the final closing date until June 7.

On May 29, after Pepper had stated that he would accept a bond in the principal amount of $110,000 as substitute security for the materials withheld, Modern obtained a bond from Globe Indemnity Co. in that amount in an effort to discharge Pepper's purported lien. The bond was presented to Pepper the same day, but he refused to accept it, to discuss its terms, or to accept any bond in lieu of his lien. This effort failing, on June 3, 1968, Modern, Mrs. Arlinghaus, and another stockholder, Howard H. Eberle ("Eberle"), commenced a summary proceeding in the New York Supreme Court, New York County, to force Pepper to give up the required materials. Substituted service proved necessary because Pepper, who had theretofore always been available, suddenly could not be located. After some jurisdictional jousting Pepper was ordered on June 5 by Justice Riccobono of the New York Supreme Court to surrender the materials in return for a suitable bond in the amount of $115,000 to be negotiated forthwith. Pepper, however, did not negotiate about the terms of the bond as ordered but rather wrote to Justice Riccobono through his attorney, Jack A. Rosen ("Rosen"), claiming that Eberle was in fact still represented by Pepper and had "specifically directed Mr. Pepper not to deliver up the stock and papers." On June 6 Mr. William E. Kelly ("Kelly"), attorney for Modern and the two stockholders in that action, sent to

---

ling of Modern Teleservice. Mrs. Pepper owned approximately 10% of the stock of Modern Teleservice.

4. In a Statement of Disputed Material Facts of September 4, 1970, Kelly, the stockholders' attorney, recited that the expiration date was May 28, 1968. This difference in dates, however, is immaterial.

5. An attorney in New York has available two types of liens to secure payment of legal fees owed. He has a common law retaining lien which attaches to the papers of his client in his possession and a statutory charging lien (N.Y. Judiciary Law § 475 (McKinney's Consol.Laws, c. 30, 1968)) which attaches to the proceeds accruing to a client through successful termination of a cause of action. See Robinson v. Rogers, 237 N.Y. 467, 470–471, 143 N.E. 647 (1924), and Note, Attorney's Retaining Lien, 65 Colum.L.Rev. 296 (1965).

Justice Riccobono a telegram from Eberle in Florida authorizing the pick-up of his shares, contrary to Rosen's representations.

On the closing date, which was the next day (Friday, June 7) no order had been signed by Justice Riccobono and further legal action to compel turnover of the materials would have been futile. Through an intermediary Pepper communicated to Unger that for a price of $75,000 he would release the materials essential to Modern's sale of its stock to Unger and compromise his claim for legal fees, further stating that he intended to leave the country on June 10 (Monday), which would render the materials unavailable for two months. In the face of this pressure Kelly negotiated with Rosen a compromise settlement which satisfied Pepper's ultimatum. This settlement contract was drafted by Rosen and signed late in the day on June 7.[6] It stated that Pepper had performed legal services, claiming $116,000 in legal fees and disbursements for which he had impressed a lien, that the validity of his claim and lien was denied by the stockholders, that the proceeding in the New York Supreme Court for recovery of the materials was pending, that the parties had agreed to settle Pepper's claim for $75,000, exchanging general releases, and that the stockholders, in executing the agreement and a separate assignment to Pepper of $75,000 of the proceeds due from Unger upon sale of their Modern stock, acted of their own free will. Upon execution of the agreement Pepper released the materials and the closing went through on the same day as scheduled. Within a few days the stockholders who had signed the settlement contract renounced it, claiming that it had been extracted through duress. On June 10 they requested the purchasers to withhold $75,000 from the purchase price and on June 12 Kelly sent a telegram to Unger informing him of the renunciation. Thereupon the $75,000 was placed in escrow in the First National Bank of Cincinnati, which subsequently brought this action and deposited the fund with the court.

The foregoing statement does not represent any findings by the court but merely our acceptance as true, for purposes of our review of the grant of summary judgment, of the stockholders' factual allegations and averments and inferences therefrom that are most favorable to them. In summary, so viewing the allegations and averments, we have a case where the stockholders owed Pepper nothing, he did not have a valid attorney's lien, they were entitled to immediate possession of their certificates, books and papers, and they had no alternative but to yield to his extortionary demands or face termination of a valuable contract for sale of Modern because of his unlawful restraint of their property.

We fully appreciate that Pepper's version of some of these facts differs sharply. For instance, he denies that he set a price of $75,000 for the release of the materials and that he threatened to leave the country; instead he claims that Unger advised him that if he did not agree to accept a settlement of his claims in the amount of $75,000, Unger would buy Modern's assets instead of its stock and leave him with a worthless lien. Moreover Rosen claims that Kelly suggested the idea of a settlement and invited him to come discuss it on June 7. Pepper further contends the closing did not, in fact, take place until June 14 and, of course, he denies any duress and asserts he had a valid claim for legal fees and thus a valid lien. These contentions, however, must await trial and cannot be accepted as true upon the present appeal.

In granting summary judgment the district court concluded that the parties had entered into a valid compromise

---

6. Ten of Modern's stockholders signed the settlement contract. As recited in note 1, *supra*, two stockholder-signatories have chosen not to contest the settlement contract; thus there are eight remaining stockholder-claimants here. Howard H. Eberle did not sign the settlement contract and thus is not a claimant here.

agreement, under the terms of which the stockholders were bound to pay the $75,-000 to Pepper, and that it was therefore unnecessary to review the factual background of that agreement. In support of his conclusion that the agreement was valid and voluntarily entered into at arm's length by the stockholders Judge McLean pointed to the fact that it had been negotiated by them through their attorney and that it expressly stated that it was executed by them of their own free will. The stockholders' claim of duress, although not rejected as a matter of law, was treated by him as conclusively refuted by the pendency of proceedings initiated by them in the state court, the court stating: "As long as their proceeding in the Supreme Court, New York County, remained undetermined, they were not compelled to settle."

■ Having reached the foregoing conclusion the district court decided that the background facts relied upon by the stockholders as proof of duress were immaterial. We disagree. In our view the district court was required to give consideration to all of the facts relied upon by the stockholders as evidence of duress rather than rely exclusively upon the terms of the compromise agreement and the pendency of the New York Supreme Court proceeding. Bearing in mind that in ruling on a motion for summary judgment it is not the function of the district court to decide whether the factual allegations and averments of the opposing party are true, we believe that if the stockholders were able at trial to prove all of the facts alleged and averred by them, they would be entitled to relief. Accordingly summary judgment should have been denied to Pepper.

■ Although it is settled that "a contract of settlement, *if valid in itself,* is final, and is to be sustained by the court without regard to the validity of the original claim," Yonkers Fur Dressing Co. v. Royal Insurance Co., 247 N.Y. 435, 444, 160 N.E. 778, 781 (1928) (emphasis supplied), a settlement contract or agreement, like any other, may be at-

tacked on the grounds that it was procured by fraud, duress or other unlawful means. See Mason v. United States, 84 U.S. [17 Wall.] 67, 74, 21 L.Ed. 564 (1872); McCarthy v. Cahill, 249 F.Supp. 194, 198 (D.D.C.1966); Aronoff v. Levine, 190 App.Div. 172, 175, 179 N.Y.S. 247, 249 (2d Dept. 1919), affd. mem., 232 N.Y. 529, 134 N.E. 558 (1921); In re White's Estate, 182 Misc. 223, 226, 46 N.Y.S.2d 917, 921 (Surr.Ct.N.Y. County 1943), aff'd mem., 268 App.Div. 759, 49 N.Y.S.2d 275 (1st Dept. 1944).

■ Under New York law, which governs, "A contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." Austin Instrument, Inc. v. Loral Corp., 29 N.Y.2d 124, 130, 324 N.Y.S.2d 22, 25, 272 N.E.2d 533, 535 (1971), and duress may take the form of unlawful restraint of property or use of wrongful economic compulsion to force a party to yield to demands that would otherwise be rejected. See Austin Instrument, Inc. v. Loral Corp., *supra* (economic duress through business compulsion), and the landmark New York decision Harmony v. Bingham, 12 N.Y. 99 (1854) (duress of property). The general rule as to duress of property or goods is that "where one party has control or possession of the goods of another and refuses to surrender such goods to the owner thereof except upon the latter's compliance with an unlawful demand, a contract made by the owner to emancipate his property is considered as one made under duress and thus avoidable." Hellenic Lines, Ltd. v. Louis Dreyfus Corp., 249 F.Supp. 526, 529 (S.D.N.Y.1966), affd., 372 F.2d 753 (2d Cir. 1967). See also Lonergan v. Buford, 148 U.S. 581, 591, 13 S.Ct. 684, 37 L.Ed. 569 (1893); Scholey v. Mumford, 60 N.Y. 498, 501 (1875); Weiner v. Tele King Corp., 123 N.Y.S.2d 101, 104 (Sup. Ct. Kings County 1953). In such circumstances it would not be a defense that the parties seeking to set aside the compromise agreement might have paid

an even greater amount unlawfully demanded and then sued for recovery rather than enter into the agreement. As Mr. Justice Holmes aptly observed "It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress." Union Pac. R. R. Co. v. Pub. Service Comm., 248 U.S. 67, 70, 39 S.Ct. 24, 25, 63 L.Ed. 131 (1918).

We do not suggest that Pepper's mere assertion of a retaining lien on Modern's materials in his possession would, standing alone, constitute duress, notwithstanding the great distress it caused to the stockholders. Such a lien is designed to create a strong incentive to persuade a client to pay attorney's fees legally owed and it "cannot be disregarded merely because the pressure it is supposed to exert becomes effective." In re San Juan Gold, Inc., 96 F.2d 60 (2d Cir. 1938); Goldman v. Rafel Estates, 269 App.Div. 647, 649, 58 N.Y. S.2d 168, 170–171 (1st Dept. 1945); Sorin v. Shahmoon Industries, Inc., 20 Misc.2d 149, 157, 191 N.Y.S.2d 14, 23 (Sup.Ct.N.Y.County 1959). If Pepper's lien was valid in any respect (which the stockholders vigorously deny) his insistence upon it could not have subjected the stockholders to duress, for generally it cannot be duress for a party to insist upon his legal rights. See McPherson v. Cox, 86 N.Y. 472, 478 (1881); Nixon v. Leitman, 32 Misc.2d 461, 466, 224 N.Y.S.2d 448, 452 (Sup.Ct.N.Y.County 1962). However, an attorney discharged for cause or guilty of professional misconduct in the handling of his client's affairs has no right to payment of fees, see In re Badger, 9 F.2d 560, 562 (2d Cir. 1925); Schwartz v. Tenenbaum, 7 A.D.2d 866, 182 N.Y.S.2d 51, 53 (2d Dept. 1959), and, *ipso facto*, no right to a retaining lien upon the papers of a former client in his possession in order to exact payment. See Matter of Weitling, 266 N.Y. 184, 187, 194 N.E. 401 (1935); Kent v. Baker, 31 Misc.2d 840, 221 N.Y.S.2d 471, 472 (Sup.Ct. Nassau County 1961); Kaplan v. Kaplan, 65 N.Y.S.2d 677, 678 (Sup.Ct.N.Y.County 1946).

If Pepper had no right to a lien upon Modern's papers (and from the testimony before the Delaware Chancery Court there appears to be substantial support for the stockholders' contention that by his conduct he forfeited whatever right to legal fees he may have had), then his assertion of a lien would have been unlawful and would hardly constitute a defense to a charge of duress. On the contrary, under the circumstances alleged here, including his refusal to accept the Globe Indemnity Co. bond in the sum of $110,000, it would be probative evidence of duress.

For the stockholders successfully to attack the settlement contract on the ground that it was obtained through unlawful duress of property, they must prove at trial that Pepper had no right to legal fees in connection with the Sonderling deal and that he refused to relinquish Modern's papers except on compliance with his unlawful demand for payment of such fees.[7] In addition, they

---

7. Since the stockholders presumably required all of the materials withheld by Pepper in order to consummate their agreement with Unger, there would apparently be no duress if Pepper had a valid lien upon a portion of them. We express no opinion as to whether duress could be shown where an attorney, knowing that his claim for fees could be adequately secured by a portion of a client's property in his possession, asserts a retaining lien against the whole for purposes of extorting funds in excess of those due him. See, e. g., In re Birdseye, 165 App.Div. 898, 149 N.Y.S. 617 (1st Dept. 1914) (no right to retain more of client's money than owed in fees); N.Y. Opinions No. 808 (Ass'n of the Bar of the City of N.Y. 1955) (implication of duty to relinquish client's papers when adequately secured by cash retained). See, generally, Aronoff v. Levine, 190 App.Div. 172, 179 N.Y.S. 247 (2d Dept. 1919), affd. mem., 232 N.Y. 529, 134 N. E. 558 (1921) (settlement contract procured through assertion of excessive mechanic's lien "filed in bad faith and to extort money" rescinded) and Restatement of Contracts § 493, Comment on Clause (d) (1932), stating that duress

must prove that further resort to legal remedies would have been impracticable or futile in the circumstances [8] and that as a practical matter there was no other means of immediate relief available to them (such as another postponement of the closing).[9] Otherwise the stockholders, represented by competent and knowledgeable counsel, who negotiated a compromise agreement stating that Pepper had performed legal services and warranting that the stockholders signed "of their own free will," would not demonstrate the element of compulsion necessary to a finding of duress.

▮ Thus the burden assumed by the stockholders is a heavy one. It may be that the district court's assumption that they are unable to sustain it will turn out to be correct. But we do not think that they may be precluded from attempting to do so merely by the fact that "their proceeding in the Supreme Court, New York County, remained undetermined." The stockholders have stated that on the date of closing (June 7, 1968) no time remained for further application to the state court, that no order had been issued by that court despite repeated communications in which the emergency nature of their

predicament had been described, and that there was no alternative but to sign the agreement or lose the deal with Unger. If these representations were proved, as we must for present purposes assume that they could be, the outstanding state court action would not preclude their establishment of duress.

▮ Assuming that the stockholders are able to prove at trial that the compromise agreement was the product of duress inflicted by Pepper, the question of relief arises. The district court correctly concluded that a finding of duress renders a contract such as this voidable but not void. See Austin Instrument, Inc. v. Loral Corp., *supra;* Leader v. Dinkler Management Corp., 26 A.D.2d 683, 272 N.Y.S.2d 397, 398 (2d Dept. 1966); Restatement of Contracts § 495 (1932). Recognizing this, the stockholders prayed for rescission of the settlement contract as well as other relief. One of the reasons advanced by the district court for granting summary judgment was that the papers of Modern, which Pepper relinquished in return for the $75.000 payment, are out of the hands of the stockholders as a result of the sale of the stock and cannot be returned to him; thus the court found rescission impossible.[10]

---

of property may be shown when "the forms of law are used not simply for the purpose for which they are intended, but in an oppressive way for purposes of extortion." In general, duress of property or goods may be proved if the party holding them, even though due something, exacted excessive payment for their release; in such a case the excess may be recovered back. See, *e. g.,* Baldwin v. Liverpool & Great Western Steamship Co., 74 N.Y. 125 (1878) (excessive payment for release of freight) and the seminal case of Astley v. Richards, 2 Strange 916, 93 Eng.Rep. 939 (K.B. 1732) (excessive payment to pawnbroker to redeem pledge); see also 13 S. Williston, Contracts § 1616 (1970).

8. See, e. g., Peyser v. Mayor, 70 N.Y. 497, 501 (1877), stating that duress of property (goods) exists when its immediate possession "is so needful and desirable, as that an action or proceeding at law to recover [it] will not at all answer the

pressing purpose." Accord, Adrico Realty Corp. v. City of New York, 250 N. Y. 29, 34, 164 N.E. 732 (1928). See also J. R. Construction Corp. v. Berkeley Apartments, Inc., 259 App.Div. 830, 19 N.Y.S.2d 500 (2d Dept. 1940); Gallagher Switchboard Corp. v. Heckler Elec. Co., 34 Misc.2d 256, 263, 229 N.Y.S.2d 623, 630 (Sup.Ct. Kings County 1962); Underhill Construction Corp. v. Ciraldo, 24 Misc.2d 29, 203 N.Y.S.2d 598, 600 (Sup. Ct. Nassau County 1960), affd. mem., 12 A.D.2d 945, 212 N.Y.S.2d 1006 (2d Dept. 1961).

9. See Radich v. Hutchins, 95 U.S. [5 Otto] 210, 213, 24 L.Ed. 409 (1877); accord, Lonergan v. Buford, *supra,* 148 U.S. at 590, 13 S.Ct. 684 and Adrico Realty Corp. v. City of New York, *supra,* 250 N.Y. at 40, 164 N.E. 732; see also Gallagher Switchboard Corp. v. Heckler Elec. Co., *supra.*

10. Pepper has also argued that the contract is indivisible and therefore cannot

Although technically rescission here as it is accomplished in a normal case is impossible, it has long been recognized in New York that "The terms upon which rescission may be granted where complete restoration of the parties to their former position is impossible rests in the sound discretion of the courts," Buffalo Builders' Supply Co. v. Reeb, 247 N.Y. 170, 176, 159 N.E. 899, 901 (1928) (per Lehman, J.), and that it is for the court "in equity to procure the declaration of a rescission on whatever terms may be just". Marr v. Tumulty, 256 N.Y. 15, 22, 175 N.E. 356, 358 (1931) (per Cardozo, C. J.). This is not the normal case; the facts here are somewhat extraordinary. In these circumstances if duress were found and rescission ordered, nothing would be required to be restored to Pepper, for the reason that since nothing would have been due him from his clients he would not have had any legal right to the return of their property. Where duress of property or goods has been found, it has never been suggested that one adjudicated to have wrongfully withheld another's property or goods for purposes of procuring forced assent to a contract resulting in an extortionary payment should receive back upon rescission the very property to which he had no right. Such a result would be extraordinary indeed and contrary to logic, reason and equity; we decline to assume that it would be required here.

Three cross-claims against Pepper were asserted below. In their first cross-claim the stockholders sought rescission of the settlement contract for duress as discussed above. In the second cross-claim they sought recovery from Pepper of legal fees and expenses incurred by them as a result of Pepper's unlawful retention of Modern's materials. Since the district court dismissed the first and second cross-claims on the basis of its grant of summary judgment in favor of Pepper, our reversal of that decision requires that we also reverse its dismissal of these cross-claims.

The third cross-claim was asserted by Mrs. Arlinghaus alone; in it she sought recovery of a sum paid to Pepper for unrelated services to her husband's estate (of which she is executrix), to which he was allegedly not entitled. The district court dismissed this cross-claim on the grounds that since the first two cross-claims had been dismissed, the court had no jurisdiction over it because it did not arise "out of the transaction or occurrence that is the subject matter" of the original interpleader action. Rule 13(g), F.R.Civ.P. Since we have reinstated the first and second cross-claims, both concededly proper within Rule 13(g), we reinstate the third cross-claim; under Rule 18(a), F.R.Civ. P., a party asserting a proper cross-claim within Rule 13(g) may join with it as many independent, unrelated cross-claims as he has against an opposing party, see 3A J. Moore, Federal Practice ¶ 18.04 [4], at 1877 n. 4 (1968); see also Crompton-Richmond Co., Inc. Factors v. United States, 273 F.Supp. 219, 221 (S.D.N.Y.1967). The district court, of course, retains the discretionary power to order severance of any claim on its own initiative pursuant to Rule 21, F.R. Civ.P.

Finally, two days before the argument of this appeal Mrs. Arlinghaus moved this court to amend the complaint by adding a fourth cross-claim against

---

be rescinded because two stockholder-claimants have ratified it by paying their shares of the fund to him. We find no merit in this argument. By an executed assignment incorporated by reference into the contract the stockholders each covenanted to pay to Pepper "the sums of money set opposite our signatures." Such covenants render the contract severable and divisible. See 4 A. Corbin on Con-

tracts § 927 (1951); Restatement of Contracts § 113, Illustration 1 (1932); see, generally, Restatement (Second) of Contracts § 112, Comment c. (Tent. Draft No. 2, 1965); Lupo v. Columbia Manicure Mfg. Co., 4 Misc.2d 413, 415, 155 N.Y.S.2d 54, 56 (Sup.Ct. Bronx County 1956). Thus it can be rescinded as to the remaining stockholder-claimants.

Pepper arising out of a recent judgment in the amount of $19,842.19 rendered by a New Jersey state court in favor of her husband's estate against him. Except to the limited extent of permitting defective jurisdictional allegations to be amended pursuant to 28 U.S.C. § 1653, we cannot consider a "new issue, not raised by the pleadings in the District Court or considered by it," whether raised by motion to amend a complaint or otherwise. Walker v. Felmont Oil Corp., 262 F.2d 163, 165 (6th Cir. 1958), cert. denied, 361 U.S. 840, 80 S.Ct. 61, 4 L. Ed.2d 78 (1959) (denying a motion to file a supplemental complaint). Accordingly the motion is denied without prejudice to its renewal in the district court.

The order of the district court is reversed and remanded for further proceedings consistent with this opinion.

MULLIGAN, Circuit Judge (concurring):

I concur in reversing the order granting summary judgment in view of the existence of disputed issues of fact which are developed in the majority opinion. I further agree that the burden assumed by the stockholders is a heavy one when they in effect attempt to establish duress as a defense to the compromise agreement, which they so quickly disavowed after having accepted its benefits. I think in fact their burden is substantially heavier than indicated in the majority opinion, and to that extent I disagree with it.

The majority indicates, *inter alia,* that the stockholders will have to show that there was no other means of immediate relief available to them, such as a postponement of the closing. I believe that the full range of reasonable alternatives available to the stockholders should be explored before the trier could conclude that their free will was so overcome that they were compelled to submit to Pepper's demands. See United States v. Bethlehem Steel Corp., 315 U.S. 289, 301, 62 S.Ct. 581, 86 L.Ed. 855 (1942); Austin Instrument, Inc. v. Loral Corp., 29 N.Y.2d 124, 130–131, 324 N.Y.S.2d 22, 25–26, 272 N.E.2d 533, 535–536 (1971). For example, I think the stockholders should be required to establish what economic consequences the loss of the Unger deal would cause the corporation. The economic coercion cases generally have involved situations where the coercer takes advantage of some desperate plight in which his victim is helplessly involved. In addition to the possibility of postponing the closing until the New York Supreme Court had acted, what were the chances of selling the assets rather than the stock, thus foiling Pepper? Why was time so essential here—would the stock become worthless or decline in value if the Unger opportunity was not seized? What other possibilities of sale exist—how marketable was the stock? In short, I believe the stockholders should develop a convincing case of exposure to real loss before they can establish their victimization by Pepper.

There is another dimension to the problem here which I would think the trier must explore. While Pepper's conduct is scored in the majority opinion, I think the trial court should determine whether the conduct of the stockholders, represented by counsel, was also open to question. While it is entirely possible that a compromise agreement can be induced by fraud, mistake or duress so as to make it vulnerable to rescission in equity or to an equitable defense if sued upon, it is also true that those who depend upon equity as a shield or a sword, must themselves have clean hands. In this case an agreement of compromise was entered into by presumably sophisticated parties in which they solemnly represented that Pepper had claimed an attorney's lien of $116,000, that it was disputed and that Pepper was willing to settle for $75,000, that the parties would exchange mutual releases and that the stockholders were acting of their own free will. In return for Pepper's surrender of all the corporate paraphernalia, the stockholders agreed to assign the agreed upon amount from the proceeds of the sale. Immediately upon the execution

of the agreement on Friday, June 7th Pepper completely performed, but on Monday, June 10th the stockholders repudiated the agreement and directed Unger to withhold payment to Pepper. While one should hesitate to characterize the motivation of either side before a trial of the issues, I think that the possibility exists that the compromise agreement was simply a charade, that it was not the product of duress but constituted a fraud upon Pepper. In any event, the circumstances of its execution and prompt repudiation by stockholders are pertinent inquiries for a court of equity in reaching any determination of economic duress.

As another noted Mansfield once observed "The principle of public policy is this; *ex dolo malo non oritur actio.* No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act." Holman v. Johnson, 98 Eng.Rep. 1120, 1121 (K.B.1775) (L. Mansfield). In this case the question will be, who has acted immorally or did both.