STATE OF MAINE
CUMBERLAND, ss

MATTHEW GEOFFROY,

Plaintiff

v.

JESSICA POWERS,

Defendant

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-12-218

STATE OF MAINE
Cumberland. ss, Clerk's Office

NOV 08 2012

RECEIVED

JUDGMENT

Jury-waived trial on the plaintiff's complaint for specific performance and injunctive relief was held. For the following reasons, judgment is entered in favor of the defendant.

FINDINGS

The parties met in 1999. They began living together in 2000 or 2001 in Massachusetts. They moved to Los Angeles in 2003 or 2004 because the defendant wanted to pursue an acting career. The parties shared expenses.

The defendant had a dog when she was young and wanted another dog. While living in California, she began to research the Vizsla breed, which she learned about from the Westminster Dog Show. She found the web site for Mari Jones, a breeder of Vizslas. The defendant contacted Ms. Jones, who never spoke to the plaintiff until the puppy was picked up.

The defendant signed a purchase and sale agreement with Ms. Jones on 6/28/05 for a female puppy. (Def.'s Ex. 2.) When there are dual purchasers, it is Ms. Jones's policy to have both purchasers sign the purchase and sale agreement and to write the names of the buyers on the agreement. Even though the plaintiff accompanied the

1

defendant to pick up the puppy, only the defendant's name appears on the agreement. (Id.) The defendant paid the deposit by check and the remainder due by cash. (Def.'s Ex. 3.) The puppy was named Ivy. (Pl.'s Exs. 2, 3.) Ivy was licensed in the defendant's name. (Def.s' Ex 4.)

The parties moved back east in 2007 or 2008 and lived with the defendant's parents, next in an apartment, and then bought a house in June 2008. Both signed the note and mortgage. The parties paid the down payment with a loan from the defendant's parents. A new heating system was paid with the defendant's inheritance and help from her parents. The parties lived in the house with Ivy and a cat, Olive. Olive still lives with the plaintiff, along with a rescued Coonhound. Both parties took Ivy to work and cared for Ivy.

When the plaintiff lost his job, the parties' relationship deteriorated. In 2009, the parties discussed ending their relationship. They argued daily and, in particular, about finances. (See, e.g., Def.'s Ex. 9 at 31-32.) They determined that the plaintiff would have the house; the defendant did not want it. Efforts to refinance the house and to remove the defendant's name from the note and mortgage were not initially successful and the plaintiff would not list the house for sale.

In September or October 2010 the plaintiff learned the defendant had been having an affair. The plaintiff described himself as "angry, upset, shocked, devastated, disgusted." The defendant described him as "volatile." The parties decided to break up immediately. The break-up was "pretty ugly." (Pl.'s Ex. 4, 5.) The plaintiff wrote to the defendant in an e-mail: "I will never speak to you again. I can barely write to you. You made my life a living hell. I hate you more than I've hated anyone in my entire life." (Pl.'s Ex. 4 at 36; id. at 72-73 ("Well, I obviously have a lot more animosity at this point than you do. As much as I attempt to take the high road and be civil, when you

2

allow your mind to think about certain things, it becomes extremely difficult. Let's both be thankful we do not have any human children.") Further, during this period, the plaintiff asked the defendant's mother to take care of Ivy because "[n]ew details have come to light and I don't think Ivy should be traded back and forth between Jess and I right now." (Pl.'s Ex. 4 at 27.)

The defendant moved out of the house on 11/1/10. Ivy remained with the plaintiff until the defendant found a place to live. The defendant did not want the plaintiff to know where she lived because of his attitude and because he had threatened her. But her refusal to give the plaintiff her address made him very angry. To maintain her privacy from the plaintiff, the defendant determined that they would exchange Ivy in public places.

The defendant retained a family law attorney, Sarah Mitchell, to represent the defendant in dealing with the plaintiff about the real estate, personal property, and Ivy. The defendant gave Attorney Mitchell an agreement given to the defendant by the plaintiff. Attorney Mitchell redrafted the agreement and subsequently sent several separation and settlement agreements to the plaintiff, which he did not sign. (Pl.'s Exs. 7, 9-11, 15; see also Pl.'s Exs. 18-19.) One of the last versions of the separation agreement provided for the parties' sharing Ivy on a rotating basis. (Def.'s Ex. 1 at 38.) Attorney Mitchell used the term "co-owners" regarding Ivy in an effort to make Ivy a "non-issue."

The defendant asked her attorney to change the language regarding Ivy in the draft settlement agreements. The defendant knew the difficult situation with the plaintiff would escalate if she maintained the language in the agreement that Ivy was the defendant's sole property. The defendant was unable to deal with another negative scenario at that time. Her father was diagnosed with bone cancer years earlier and, after

3

a very difficult illness, died in March 2011. In addition, Ivy was having eye problems that required surgery.

Attorney Mitchell recommended that the defendant not share Ivy with the plaintiff. Further, Attorney Mitchell recommended the defendant obtain an order for protection from abuse. (Def.'s Ex. 9 at 3-8; Def.'s Ex. 1 at 159; Pl.'s Ex. 4 at 33-34.) Although Attorney Mitchell recommends obtaining such an order very rarely, fewer than ten times in her ten-year career, she strongly recommended the defendant obtain an order after Attorney Mitchell read e-mails from the plaintiff to the defendant. (Def.'s Ex. 9 at 1-2; Pl.'s Ex. 4 at 31-32.) Because the defendant was not emotionally able to handle another confrontation with the plaintiff, she did not seek an order.

Although the parties attempted to share Ivy, there were difficulties, which resulted in many messages exchanged. (Pl.'s Ex. 6; Pl.'s Ex. 4 at 100-102; Def.'s Ex. 9 at 10-16.)[1] The calls, e-mails, and text messages began days before a planned exchange of Ivy. Very often the messages addressed issues other than Ivy. Efforts to rearrange times for the exchanges persisted. For example, at one point, the plaintiff suggested an exchange of Ivy every three days. (Pl.'s Ex. 6 at 18.) On 12/29/10, just prior to the signing of the agreement with regard to Ivy, the plaintiff threatened to call the police if Ivy was not returned to him. (Pl.'s Ex. 4 at 118.) On another occasion, the plaintiff alleged that the defendant arrived late, even though she had not, and refused to meet her for the exchange of Ivy. In an e-mail to the defendant on 12/4/10, the plaintiff stated: "[y]ou should have thought about Ivy before cheating on me with John Sullivan. You cheated, you lied, and you used me for financial support throughout your infidelity.

---

[1] On 10/6/10, the plaintiff stated to the defendant in an e-mail that "I truly don't ever want to see you again, if I can make that possible" and "[t]his is my final communication to you." (Def.'s Ex. 9 at 5-6.)

4

Your actions do have consequences. I am not giving Ivy back. I am done with you and all this is a result of YOUR actions." (Pl.'s Ex. 4 at 102.)

The defendant signed the 12/31/10 agreement for the same reasons she requested a change in the language in the settlement agreements. The latter part of 2010 was a volatile time and the defendant and her family were dealing with many difficulties. At the time, the house situation was still unresolved and the plaintiff continued to refuse to consider selling the house. The defendant stated that nothing in her life was stable and she was unable emotionally to deal with the adversity associated with Ivy. Further, she signed the agreement in order to be able to see her dog. She was very concerned that the plaintiff would withhold Ivy as he had previously. The one thing that provided solace to the defendant was Ivy.

On 12/8/10, Attorney Mitchell sent a letter to the plaintiff to inform him that the previously sent agreement was null and void. She also stated,

> [o]n the issue of the dog, Ivy, Jessica proposes that you turn the dog over to her as her sole property, and she will waive your half of the significant veterinary bills recently incurred for Ivy. In the alternative, if you refuse to return Ivy to Jessica as you previously agreed, she will not hesitate to go to court on that issue and to seek back from you the money expended for Ivy's recent surgery.

(Def.'s Ex. 1 at 68.)

Attorney Mitchell did not hear from the defendant from mid-December 2010 until April 6, 2011. On 4/12/11, Attorney Mitchell first saw the agreement with regard to Ivy signed by the parties on 12/31/10. (Def.'s Ex. 1 at 24-25; Pl.'s Ex. 1.) Attorney Mitchell did not create the agreement, did not participate in the signing of the agreement, did not recommend that the defendant sign the agreement, and did not discuss the document with the plaintiff.

5

Contrary to the language of the 12/31/10 agreement, the cost and burden of veterinary care was borne by the defendant, including Ivy's eye surgery. (Def.'s Ex. 5-8; 9 at 21-24.) The plaintiff agreed at trial that he had not reimbursed the defendant for any veterinary bills since the end of 2010 but justified his nonpayment on not being shown receipts. The defendant requested payment once after a cost was incurred but did not make subsequent requests for payment because she did want to deal with the plaintiff's anger and hostility.

The parties eventually were able to refinance the house loan and to remove the defendant from the documents in February or March 2012. The defendant contributed to the closing costs. The escrow check was sent to the defendant.

On 4/3/12, the plaintiff was scheduled to deliver Ivy to the defendant but he did not appear. The defendant was very nervous because the plaintiff had stated that people had told him he should keep Ivy for good and he had previously stated he would not return Ivy. The defendant sent a text to the plaintiff. She was very nervous about the situation but knew the plaintiff needed the escrow check. The plaintiff called and arranged for a meeting the next morning. Even though she was scheduled to receive Ivy that evening, she capitulated to the plaintiff's dictates. He then called again and said he would drop off Ivy right away that evening. They met at 9:30 p.m. The plaintiff appeared intoxicated. The defendant gave the plaintiff the escrow check and was given Ivy.

On April 11, 2012, the defendant informed the plaintiff that Ivy would no longer go back and forth between the parties. (Pl.'s Ex. 6 at 30; Def.'s Ex. 9 at 29-30.) She determined that the continuous contact between the plaintiff and her had to end. The plaintiff's response, once again, focused on the affair: "I helped provide a home for you, Jess, while you cheated on me with John Sullivan. A worm with a wife and baby at

6

home. You were broke and jobless for much of that time and when you were employed, you were using the basement at STA to carry out your home wrecking . . . . I'm not done with the police and I've contacted a lawyer." (Pl.'s Ex. 32.) The plaintiff last saw Ivy on 4/4/12.

CONCLUSIONS

The plaintiff seeks equitable remedies of specific performance and injunctive relief. One who seeks equity must do equity. See Hamm v Hamm, 584 A.2d 59, 61 (Me. 1990) ("it is an elementary principal of equity jurisprudence that 'whenever a party, who as actor seeks to set the judicial machinery in motion and obtain some remedy, *has violated conscience or good faith, or other equitable principle in his prior conduct*, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right or to award him any remedy.'") (emphasis in original). Both the grant of equitable relief and the withholding of such relief are addressed to the sound discretion of the court." Great Hill Fill & Gravel, Inc. v. Shapleigh, 1997 ME 75, ¶ 7, 692 A.2d 928 ("A decree of specific performance can never be claimed as a matter of right.")

The court concludes that the 12/31/10 agreement was signed by the defendant under duress and is, therefore, voidable. See Estate of Whitlock, 576 A.2d 748, 750 n.3 (Me. 1990) (referencing RESTATEMENT (SECOND) OF CONTRACTS § 175 (1981)). The defendant's testimony was credible. She described the very difficult circumstances in her life during the latter half of 2010, especially regarding her father, her volatile relationship with the plaintiff, and her complete inability to deal emotionally with more adversity. Most importantly, because of the plaintiff's conduct and threats, she feared that Ivy would not be returned to her if she did not enter the agreement with the plaintiff. See First National Bank of Cincinnati v. Pepper, 454 F.2d 626, 633 (2nd Cir. 1972)

7

("duress may take the form of unlawful restraint of property or use of wrongful economic compulsion to force a party to yield to demands that would otherwise be rejected."); see also Houseman v. Dare, 966 A.2d 24, 29 (N.J. 2009) (trial court is best potion to evaluate equities implicated by request for specific performance regarding a dog).

The testimony of Attorney Mitchell, also credible, and the parties' e-mails support the conclusion that the defendant was emotionally vulnerable and dealing with an unstable and volatile relationship with the plaintiff that should have ended but did not because of issues surrounding the house and Ivy. The defendant's continued adherence to the plaintiff's demands resulted from those same circumstances. She signed the agreement and acquiesced to the plaintiff's demands so he would return Ivy, which he previously had agreed to do. See Panasonic Communications & Systems Co. v. State of Maine, 1997 ME 43, ¶ 12, 691 A.2d 190.

Although the plaintiff was, understandably, upset about the defendant's relationship with another man, his reaction and subsequent conduct are unjustified. The continued exchange of Ivy has not gone well and has provided to the plaintiff an opportunity to continue to display his anger regarding the defendant's conduct and to remain in her life. The situation is not safe and results from interests other than a dog. As the defendant stated at trial, "this chapter needs to close."

The entry is

> Judgment is entered in favor of the Defendant and against the
> Plaintiff on the Plaintiff's Complaint.

Date: November 8, 2012

Nancy Mills
Justice, Superior Court

8

MATTHEW C GEOFFROY VS JESSICA M POWERS
UTN:AOCSsr  -2012-0042182                          CASE #:PORSC-CV-2012-00218
----------------------------------------------------------------------
MATTHEW   C. GEOFFROY                                         PL
    SHERMAN, DAVID  Tel# (207) 772-1941
        84 MARGINAL WAY SUITE 600 PORTLAND ME 04101-2480

JESSICA   M. POWERS                                          DEF
    CHURCHILL, SARAH A.    Tel# (207) 283-6400
        110 MAIN ST., SUITE 1520 SACO ME 04072