547 F.2d 708
 The FIRST NATIONAL BANK OF CINCINNATI, Plaintiff,
v.
Sidney PEPPER, Appellant-Cross-Appellee,
Rosalie M. Arlinghaus, Individually, et al., Appellees,
Rosalie M. Arlinghaus, as Executrix of the Will of
Frank H. Arlinghaus, Appellee-Cross-Appellant.
 Nos. 7, 8, Dockets 75-7519, 75-7545.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 20, 1976.
Decided Nov. 16, 1976.
 
 Elias Rosenzweig, New York City (Harvey J. Ishofsky, and Brauner Baron Rosen- zweig Kligler & Sparber, New York City, of counsel), for appellant-cross-appellee.
 Preben Jensen, New York City (Casey, Lane & Mittendorf, New York City, of counsel), for appellees-cross-appellant.
 Before FRIENDLY, HAYS and TIMBERS, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 * This interpleader action, 28 U.S.C. § 1335, wherein the claimants are of diverse citizenship, has been pending in the District Court for the Southern District of New York since 1968, where it has accumulated seven closely typed pages of docket entries. The issue which led to the bringing of the action was whether an agreement between Sidney Pepper who had been attorney for Modern Talking Picture Service, Inc. (Modern), Frank Arlinghaus, its founder and controlling stockholder, and his estate and Mrs. Arlinghaus and other stockholders of Modern settling Pepper's claims for attorney's fees at $75,000, was voidable for duress of property. The case has been in this court before, First National Bank of Cincinnati v. Pepper, 454 F.2d 626 (2 Cir. 1972), on appeal from an order of the late Judge McLean granting Pepper's motion for summary judgment and dismissing the stockholders' related cross-claims. We there held that the action presented triable issues of fact and reversed the summary judgment order, remanding for trial. This was held before Judge Frankel and resulted in a judgment against Pepper voiding the settlement agreement and disallowing his claim.
 
 
 2
 In view of the terms of the agreement, which are set out in the margin,[1] and especially paragraph 6, it is understandable that Judge McLean thought summary judgment for Pepper was appropriate and that, in reversing his decision, this court said "the burden assumed by the stockholders is a heavy one." 454 F.2d at 634. Judge Frankel concluded that this burden, outlined in more detail in a passage from the majority opinion by Judge Mansfield, 454 F.2d at 633-34, quoted in the margin,[2] had been met.
 
 
 3
 If the stockholders could avoid the settlement only by proving that, as said in our previous opinion, see fn. 2, "Pepper had no right to legal fees in connection with the Sonderling deal" (emphasis supplied), we would be constrained not simply to reverse but to direct judgment in favor of Pepper for the amount provided in the settlement. We disagree, respectfully but nonetheless firmly, with the district court's conclusion that Pepper was not entitled to any legal fees above his monthly retainer, either from Modern or from the stockholders. This conclusion is not a "finding of fact" protected by the "unless clearly erroneous" rule, F.R.Civ.P. 52(a), but rather a mixed question of law and fact open to full review. In re Hygrade Envelope Corp., 366 F.2d 584, 58789 (2 Cir. 1966); James Talcott, Inc. v. Wharton, 543 F.2d 986, 995 (2 Cir. 1976).
 
 
 4
 It is common ground that consideration must begin with the retainer agreement embodied in a letter dated January 4, 1966, from Pepper to Carl Lenz, who had become president of Modern on Frank Arlinghaus' death in 1964. This read:
 
 
 5
 Pursuant to the request at the last directors' meeting we are setting forth our understanding of the retainer of this firm by the corporation.
 
 
 6
 The retainer includes all legal services for the corporation of the character and amount heretofore performed which can be performed in the City of New York during customary business hours, but not litigation and special services such as trademark services. No charge shall be made by us for any legal services not covered by the retainer except with your prior approval.
 
 
 7
 If the character of the corporation's business should change substantially by reason of the entry into new activities, we shall have the right to ask for a reconsideration of the amount of the retainer.
 
 
 8
 We suggest that the retainer be for a calendar year with automatic renewal for consecutive like periods unless either of us shall request a change before October 1st of the current year. For the first year hereunder the amount of the retainer is to be considered and fixed at the next Board of Directors meeting.
 
 
 9
 If there is anything in the foregoing which is not entirely clear or which you may wish to add, I will be glad to discuss it with you at your convenience.
 
 
 10
 According to handwritten notes on Modern's copy of the letter, the retainer agreement was amended on March 15, 1966 so that the retainer should run over the fiscal year rather than calendar year, and notice of nonrenewal had to be given by April 1 of the current year rather than October 1. (Arlinghaus exhibit 1-A; trial transcript at 197-98).
 
 
 11
 There is uncontroverted proof that, beginning in the fall of 1967, Pepper, at the request both of Mrs. Arlinghaus and of the management, approached a number of companies with a view to their acquiring the stock or assets of Modern.[3] This effort was due in part to Mrs. Arlinghaus' need for cash to pay the federal tax on her husband's estate. The efforts included the usual jockeying with respect to price (including whether the price would be paid in cash or in securities issued by the purchaser), the furnishing of data about Modern, and some consideration of legal matters, particularly the relative advantages of the sale of stock or of assets. Mrs. Arlinghaus and Lenz were kept apprised of the various communications. Ultimately these efforts led to a letter dated March 20, 1968, addressed to the board of directors but delivered to Pepper, from Sonderling Broadcasting Corporation which already was acquiring a sister company, Modern Teleservice, Inc. (Teleservice). Sonderling made a firm offer of $2,800,000 for all of Modern's stock or assets. This prospective purchaser had been found by a Philadelphia firm, Commonwealth Corporate Development Co., Inc. (Commonwealth), which was headed by Harris Shapiro and with which Steven Weil of Corporate Finders and Consultants, Inc. was cooperating. Under date of March 21, 1968, Commonwealth addressed a letter to Pepper stating that in the event of consummation of the sale it was to receive the excess paid by Sonderling over and above $2,500,000. Pepper was to receive half of this, subject to a maximum of $100,000. Pepper agreed to this and procured the consent of Mrs. Arlinghaus and of Howard H. Eberle (who was, as trustee under an inter vivos trust, the second largest stockholder). On March 22 Pepper wrote the president of Sonderling accepting its offer on behalf of Mrs. Arlinghaus and Eberle.
 
 
 12
 Modern's board of directors met on April 8, 1968. By this time the Sonderling proposal had become one for the purchase of assets. The minutes recite that Pepper proposed "on behalf of Mrs. Arlinghaus and Mr. Eberle" a resolution authorizing such a sale for $2,800,000. The resolution provided for payment of a $300,000 fee to Commonwealth on completion of the sale; this was "with the understanding that Sidney Pepper, counsel and a director for the corporation, is to make no charge to the corporation for his services in connection with the said sale, but is to receive $100,000 from Commonwealth Corporate Development Co., Inc." The resolution was carried by a divided vote, with Pepper not voting and three directors, all of them officers but two of them not stockholders, voting against it. Another resolution terminated the employment of all officers and employees, with three exceptions including Pepper, upon the effective date of the sale. This was followed by the preparation of an agreement of sale consisting of 23 typewritten pages and numerous schedules filling out Modern's representations and warranties.
 
 
 13
 While all this was going on, Dan Kater, a vice president of Modern, had been soliciting the interest of Sherman Unger, a Cincinnati attorney. Unlike Sonderling, Unger did not want to run the business himself; he wished to retain Modern's officers and agreed to allow them a 30% participation in the stock he and his associates would purchase, at the same price and with a period of years in which to make payment. Lenz arranged a meeting between Unger and Pepper on March 12; Unger offered a price of $20 as compared with the $26.45 later offered by Sonderling. Pepper advised Mrs. Arlinghaus, who had been on a cruise, of Unger's offer. At a meeting with Mrs. Arlinghaus, her daughter and Pepper on March 25, Unger indicated that his offer was now $21 per share.
 
 
 14
 The Sonderling transaction was to close on May 14, 1968. On May 9, appellee Richard M. Hough, owner of 500 of Modern's 94,500 shares, acting through Delaware counsel recommended by Unger, brought suit in Delaware to enjoin consummation of the Sonderling sale. On the morning of May 14, 1968, the Chancellor issued a temporary injunction, finding after a one-day hearing that Pepper had not transmitted to Modern's board of directors the March 20, 1968 letter addressed to them by Sonderling, although he had revealed to the board the $2.8 million purchase price proposed in that letter, as well as the fee arrangement; that Mrs. Arlinghaus and Eberle had acquired on April 8, 1968, an interest in Sonderling through the closing of a sale to Sonderling of Modern's sister company in which they held stock; that Pepper also had an interest in Sonderling by reason of the same transaction; that Pepper had failed to quote the $2.8 million Sonderling price to Unger, thereby denying him the chance to make a competitive counteroffer; and that the April 8 resolution presented to and approved by the board had contained significant "uncertainties as to what the final purchase price would be" because the purchase resolution provided that an escrow fund should be set aside to make good any damages suffered by Sonderling from breach of warranty or misrepresentations in regard to Modern's assets or liabilities and the like, and in regard to "such other facts which counsel for Sonderling Broadcasting Corporation may request as a condition to the making of such contract" conditions not unusual in purchase offers made prior to opportunity for full investigation. The Delaware injunction led Sonderling to withdraw since its financing expired on May 14.
 
 
 15
 By letter dated May 10 and received on May 13, Unger raised his offer to buy all the stock to a price of $27 per share. A board meeting was held on May 24. At the instance of the officers who had voted against the sale to Sonderling, the board accepted an alternative proposal of Unger for an asset purchase in the event that all the stock was not tendered. In fact all the stockholders agreed. Pepper was discharged as corporate counsel, as he had earlier been as Mrs. Arlinghaus' attorney; he was succeeded in both capacities by William E. Kelly whom Unger had recommended. About the same time came the demand on Pepper to turn over certain papers which Modern would require at the closing with Unger, including its minute book, stock certificate book, by-laws and Mrs. Arlinghaus' and Eberle's stock certificates; his refusal to do this unless he was paid $100,000 legal fees and $10,000 (later raised to $15,000 or $16,000) as "expenses"; the uncompleted summary proceedings in the Supreme Court for New York County to force him to deliver the books and certificates upon Modern's furnishing an appropriate bond; and the settlement agreement described in our prior opinion, 454 F.2d at 630-31, and earlier in this one.
 
 
 16
 Judge Frankel concluded that neither Modern nor the stockholders owed Pepper anything beyond the retainer for his ultimately successful efforts to secure a purchaser and his work on the asset sale agreement with Sonderling and that they had no practicable alternative save to yield to his demands to the extent of settling for $75,000. Accordingly he dismissed Pepper's claim against the fund deposited in the interpleader.
 
 
 17
 As stated above, we cannot agree with the district court's conclusion that Pepper's activities from September 1967 to May 1968 in endeavoring to effect a sale of Modern's stock or assets "represented nothing beyond what MTPS was entitled to for the $1,000 per month under the retainer agreement." The retainer included "all legal services for the corporation of the character and amount heretofore performed which can be performed in the City of New York during customary business hours, but not litigation and special services such as trademark services." Appellees have advanced no basis for escaping the logic of Pepper's argument that services to the corporation "of the character and amount heretofore performed" would not ordinarily include services that would produce the demise of the corporation or a complete change in its ownership. Pepper's argument is strengthened by the fact that his law firm had been serving as regular counsel to Modern for 30 years, and that the 1966 retainer antedated any significant efforts to find an outside purchaser for Modern. Insofar as Pepper's services in the search for a buyer looked to the sale of stock rather than of assets they were technically not "services for the corporation," yet it is common practice for corporations to pay for such services when the sales of stock are not consummated; indeed, in the case of corporations with more than a few stockholders, it is hard to see how else the matter can be handled. It may well be that many of Pepper's services did not require the skills of a lawyer but could have been performed by the officers or by a business broker with knowledge of the legal problems that arise on transactions of this sort. Yet such services often are rendered by lawyers and if a corporation asks its lawyer to perform them, it should not be heard to say that the services are not sufficiently legal to give rise to an attorney's lien. Beyond all this, our own experience tells us that, even in 1966, a retainer of $1,000 a month in New York City could not have been thought to include negotiations for and the drafting of letters and contracts for the sale of a corporation's assets or stock at prices in excess of $2,000,000.
 
 
 18
 Appellees are thus remitted to the clause in the retainer:
 
 
 19
 No charge shall be made by us for any legal services not covered by the retainer except with your prior approval.
 
 
 20
 Of course, this would not bar any claim by Pepper for services to the stockholders as distinguished from services to the corporation, and the ultimate sale of the stock to Unger at $27 per share as compared with Unger's initial offer of $20 or $21 could well be regarded as a fruit of Pepper's labors, including the working-out of the contract for the sale of assets to Sonderling. Beyond that we would not be disposed to apply the clause to a case where the top management and the controlling stockholders of a corporation requested over a period of months the performance of services that were clearly beyond the scope of the retainer.[4]
 
 
 21
 We understand the district court's dislike of Pepper's effort to obtain a $100,000 share in the finder's fee on the Sonderling sale. However, the fee arrangement was disclosed initially to Mrs. Arlinghaus and Eberle and, at the time of the April 8 vote, to the board of directors. Moreover it was accompanied by a waiver of any right to legal fees. The district court was also unfavorably impressed, as we are, by Pepper's efforts to delay an order by the New York Supreme Court which would have bonded out his lien. But the equities are not all on one side. Pepper had assisted in working out a deal which would have yielded Modern's stockholders $26.45 per share, only to find that the officers, who not only would not benefit but would lose their jobs, were undermining him by working with Unger, who was then offering only $21 at the same time aiming at Pepper's discharge and a complete repudiation of liability to him for legal fees. One can understand, although not applaud, that Pepper took this as he did.
 
 
 22
 Pepper contends that once we have come to the conclusion that he was owed something, we must uphold the settlement agreement. Such a literal application of the language from this court's previous opinion quoted in fn. 2 supra is, we think, not at all what the earlier First National Bank panel had in mind. The court also observed in that opinion that
 
 
 23
 In general, duress of property or goods may be proved if the party holding them, even though due something, exacted excessive payment for their release; in such a case the excess may be recovered back.
 
 
 24
 454 F.2d at 634 n. 7 (emphasis added). The principle that an excessive demand can constitute duress even when the party holding the goods is legitimately due something appears well established in New York law. See, e. g., Aronoff v. Levine, 190 App.Div. 172, 179 N.Y.S. 247 (2d Dept. 1919), aff'd, 232 N.Y. 529, 134 N.E. 558 (1921), in which the defendant was found to have used duress in asserting a $2,440 lien on three finished buildings, because the amount he was owed for his work came legitimately only to $112. The existence of some debt on the part of the plaintiff to the defendant was not enough to negate a finding of duress. Similarly, in Nixon v. Leitman, 32 Misc.2d 461, 224 N.Y.S.2d 448 (Sup.Ct. New York County 1962), the court observed of an inventor claiming a sum under a contract (by which he had released rights under an earlier assignment contract) that he was not barred by a defense of duress "(s)o long as the settlement of his rights (in the later contract) is for an amount within the reasonable limits of his claim." 224 N.Y.S.2d at 453. By implication, the fact that plaintiff had a legitimate claim to some recovery would not have barred a finding of duress if his asserted claim was too high. See also Restatement Second of Contracts (Tentative Draft No. 11, April 15, 1976), § 318, Illustration 16.
 
 
 25
 We think Pepper had no reasonable basis for believing he was entitled to a legal fee of $100,000 or even to a fee of $75,000, the amount for which he ultimately settled. The $100,000 figure clearly took as a benchmark the share in the finder's fee in the Sonderling transaction and is thus suspect. Taking Pepper's own analysis of his services (Joint Appendix 611a-612a) and realizing that, of the 33 persons or corporations listed in the annexed schedule, negotiations with only two, Sonderling and Unger, proceeded in real depth and that only the Sonderling transaction involved drafting or litigation, we cannot believe that any lawyer in 1968 would have reasonably deemed these services to be worth $100,000 or even $75,000.[5] Pepper's threat to retain the corporate papers and stock certificates unless this amount was paid was thus an improper one.
 
 
 26
 This alone, however, would not suffice to make the settlement voidable. The cross-claimants must also meet the second requirement of showing, in the language of the Restatement Second of Contracts § 317, that they had "no reasonable alternative" to settlement with Pepper.
 
 
 27
 We agree with Pepper that appellees failed to show that Unger would not have been willing to extend the date for closing (as distinguished from the date of acceptance) beyond June 7. But the stockholders were not in a position to accept Unger's offer unless they were certain they could deliver; otherwise they might be exposing themselves to an action by Unger for breach of contract. Pepper's counsel suggests that such certainty did indeed exist since the New York court could have been expected to take decisive action within a few days. Assuming this to be true, the problem was the uncertainty whether Pepper would then have been available. On June 7, Weil, co-broker of Shapiro and Commonwealth said in a telephone talk with Unger, who passed this on to the Modern stockholders, that Pepper was about to leave on a vacation, adding
 
 
 28
 You know, Sidney takes a month or two months off and he goes on these safaris to New Guinea, Africa, way-out places; go and try and reach him there.
 
 
 29
 Counsel denies that Pepper had any intention of leaving the country; indeed he contends that Pepper's physical condition precluded any safaris and notes that Lenz told the stockholders at the June 7 meeting about this. But if Pepper authorized Weil to press for the settlement on his behalf, and there is ample evidence for this, he is bound by what Weil said. Indeed, even absence in Arizona, where Pepper did visit for more than a week beginning June 9 or 10, might have sufficed to abort the sale to Unger. Although we deem the question to be closer than did the district court, we thus are not disposed to overturn its conclusion that
 
 
 30
 In the difficult, somewhat frenetic circumstances confronting them on June 7, the cross-claimants soundly and reasonably believed they faced irreparable harm, with no other feasible remedy than to conclude the agreement with Pepper.
 
 
 31
 The upshot is that we agree that the settlement is voidable for duress of property but hold that as a condition to obtaining avoidance, appellees must pay Pepper a reasonable attorney's fee for all services from September 1967 to May 1968 in efforts to secure a purchaser for Modern's stock or assets, together with reasonable disbursements relating thereto, and any damages suffered by Pepper from premature termination of the yearly retainer running to the end of Modern's 1969 fiscal year. This conclusion is merely an application of the ancient principle that he who seeks equity must do equity, 1 Story, Equity Jurisprudence § 69 (1918); 2 Pomeroy, Equity Jurisprudence §§ 385, 393b (1941).
 
 
 32
 We do not think that Pepper forfeited his claim to a reasonable attorney's fee for his services because of his behavior after the Delaware Chancery proceeding. (This issue was not reached directly by the district court because of its interpretation of the retainer agreement, but was briefed in the parties' post-trial briefs.) Pepper had, by the time of the fight over the papers, already been discharged as counsel by Mrs. Arlinghaus and Modern. His subsequent behavior, although not commendable, can hardly be read backwards to cancel a valid claim for prior services, particularly since he had ceased to occupy any position of special trust toward the stockholders as counsel. If his discharge had been for cause arising from the Sonderling transaction, the case would be different, see Gonzales v. Hegner, 20 Misc.2d 232, 192 N.Y.S.2d 212, 214 (Sup.Ct. New York County 1959); Gary v. Cohen, 34 Misc.2d 971, 231 N.Y.S.2d 394, 398 (Sup.Ct. New York County 1962), but, even with the record of the Delaware Chancery proceeding before us, we do not think his conduct in the Sonderling deal warrants the characterization preliminarily drawn by the Delaware Chancellor, and do not find it to be "cause" for discharge sufficient to disentitle him to reasonable compensation for prior services, Matarrese v. Wilson, 202 Misc. 994, 118 N.Y.S.2d 5, 9 (Sup.Ct. Bronx County 1952); Gonzales v. Hegner, supra, 192 N.Y.S.2d at 213.
 
 
 33
 A final word must be said about the effect of our voiding of the settlement agreement on the companion case of Arlinghaus v. Ritenour, 543 F.2d 461 (2 Cir. 1976). In that dispute, between Mrs. Arlinghaus as plaintiff and Pepper and two officers of Modern Teleservice, Inc., as defendants, Mrs. Arlinghaus alleges that a sale of Teleservice stock to the defendants in June 1967 was made at an excessively low price and involved breaches of fiduciary duty by Pepper and the Teleservice officers. The settlement agreement executed on June 7, 1968 between Pepper and the Modern Talking Picture Service stockholders, including Mrs. Arlinghaus, contains a provision in paragraph 5 for general release of all legal claims of the parties against each other, with the exception only of some promissory notes executed by Mrs. Pepper and the Teleservice officers to Mrs. Arlinghaus in the June 1967 sale:
 
 
 34
 5. Upon receipt of the said $75,000, Pepper shall have no further claim of any kind or type against any of the Stockholders or the Corporation and the Stockholders on one hand and Pepper on the other hand shall fortwith (sic ) exchange general releases, releasing each other, except for any promisory (sic) notes executed by Miriam J. Pepper, John J. Lipsky and any collateral security for such notes and, in addition Pepper agrees to execute and deliver a general release to Modern Talking Picture Service, Inc. (Emphasis added).
 
 
 35
 Although we doubt that at the time of the June 7, 1968, settlement agreement the parties were contemplating a possible action by Mrs. Arlinghaus against Pepper in connection with the 1967 Teleservice sale, the language of the mutual release is general enough to embrace such an action, particularly given the specific exception made for the promissory notes that were part of the 1967 transaction.
 
 
 36
 The parties in Arlinghaus v. Ritenour appearing before Judge Werker agreed to be bound in that case by Judge Frankel's findings in the present case as to the enforceability of the release, even though the parties in the two cases are somewhat different. Judge Frankel found the release unenforceable because the whole 1968 settlement agreement was voided by duress. Although we have differed with Judge Frankel's conclusion that Pepper was owed nothing in the way of legal fees, we have not overruled his conclusion that the settlement agreement should be voided, and hence our decision does not call for any change in Judge Werker's ruling that under the stipulation Pepper cannot avail himself in the Teleservice litigation of the releases executed pursuant to the Modern settlement agreement.
 
 
 37
 We therefore remand the cause for the determination of a reasonable attorney's fee (including such damages, if any, as may be owing for premature termination of the retainer) and disbursements in accordance with this opinion. It is greatly to be hoped that the parties will now bring this controversy to an end without further expenditure of judicial resources.
 
 II
 
 38
 We turn now to Mrs. Arlinghaus' appeal from the district court's refusal to give full faith and credit to a judgment of the Probate Division of the County Court of Monmouth County, New Jersey (sometimes hereafter the New Jersey court) filed August 30, 1971, which, so far as here relevant, disallowed payments theretofore made by the estate of Frank H. Arlinghaus to the firm of DeWitt, Pepper & Howell for legal services and disbursements in the amount of $19,842.19, and entered judgment against the firm and Sidney Pepper and Harry E. Howell, the surviving partners, in that amount plus interest from January 2, 1968.
 
 
 39
 Mr. Arlinghaus was a resident of New Jersey and his will was probated in the Monmouth County Court. Mr. DeWitt was licensed to practice in New Jersey, and Mrs. Arlinghaus retained him or the firm just which is not altogether clear to represent the estate. At all times relevant hereto New Jersey C.P.R. 4:42-9 provided:
 
 
 40
 (a) Actions in Which Fee Is Allowable. No fee for legal services shall be allowed in the taxed costs or otherwise, except
 
 
 41
 (2) Out of a fund in court. The court in its discretion may make an allowance out of such a fund, but no allowance shall be made as to issues triable of right by a jury. A fiduciary may make payments on account of fees for legal services rendered out of a fund entrusted to him for administration, subject to approval and allowance or to disallowance by the court upon settlement of his accounts.
 
 
 42
 (b) Affidavit of Service. Except in tax and mortgage foreclosure actions, all applications for the allowance of fees shall be supported by an affidavit stating in detail the nature of the services rendered, the amount of the estate or fund, if any, the responsibility assumed, the results obtained, the amount of time spent by the attorney, any particular novelty or difficulty, the time spent and services rendered by paraprofessionals, other factors pertinent in the evaluation of the services rendered, and the amount of the allowance applied for, and an itemization of disbursements for which reimbursement is sought.
 
 
 43
 Pursuant to the authority contained in subdivision (a)(2), Mrs. DeWitt as executrix of her husband's estate received payments on account of $15,000, and thereafter the firm, then consisting of Pepper and Howell, received payments on account of $19,842.19.
 
 
 44
 By order to show cause filed October 9, 1970, the New Jersey court directed inter alia, the DeWitt firm, Pepper and Mrs. DeWitt to file twenty days before the return date, December 4, 1970, "their respective affidavits in form and substance sufficient to comply with the aforesaid Rules, stating in detail (i) the nature of the legal services they, and each of them, allegedly performed, (ii) the amount of time spent thereon, (iii) any particular novelty or difficulty thereof, (iv) an itemization of disbursements for which they were or expect to be reimbursed . . . " and also that the same persons submit proof on the return date "as to what amounts, if any, are properly payable to them for legal services rendered and that they, and each of them, show cause why they should not be ordered and directed to repay to the estate such amounts as this Court may find to be excessive . . . ." The order to show cause further provided that in default of the timely filing of the required affidavits or upon failure to submit the required proof, the same persons should show cause on the return date "why they and each of them should not be ordered and directed to repay to the estate the following sums paid to them on the dates indicated for alleged legal services performed and expenses incurred . . . ." The order to show cause provided that it and the complaint which led to it should be served personally or by certified mail, return receipt requested, postage prepaid. Pepper does not dispute that he received mail notice.
 
 
 45
 In response to the order to show cause, Pepper addressed a long letter to the New Jersey judge who had signed it, outlining the services for which payment had been received. These were primarily the working out of arrangements to eliminate the "buy-back" options which Modern and Teleservice and their other stockholders held on Mr. Arlinghaus' stock, the preparation of the federal estate tax return and the handling of the I.R.S. audit. Allegedly all of these services were performed in New York. Appended to the letter was a short affidavit stating that the facts were true and that "the value of services performed in the above captioned matter," to wit, "Estate of Frank H. Arlinghaus, Deceased, Monmouth County Court, Probate Division, Docket No. 77831," "far exceed the monies paid to me." The letter also stated that in furnishing the details of his services he did so "as an Attorney out of respect for the Court and with no intention as a nonresident of New Jersey . . . to submit to the jurisdiction of the Court," and that "(t)his letter is accordingly to be deemed a nullity, as if not submitted by me, if its submission by me could constitute a submission by me to the jurisdiction of a Court of New Jersey."
 
 
 46
 The order to show cause did not come on for hearing until the summer of 1971. In its judgment, filed on August 30, 1971, the court noted that there was no appearance on behalf of DeWitt, Pepper & Howell (although there was one on behalf of Mrs. DeWitt). The court disallowed the payments made to DeWitt, Pepper & Howell "for alleged legal services and alleged disbursements" in all respects. Having found that it had personal jurisdiction over the firm, Pepper, and Howell and that they had not filed the required affidavits "in form and substance satisfactory to this Court," the court entered judgment against them in the sum of $19,842.19 with interest from January 2, 1968.[6]
 
 
 47
 The district court declined to enforce the judgment, finding New Jersey's "assertion of jurisdiction to have been ineffectual." It was of the view that the cause of action "does not arise out of acts done or transactions consummated in New Jersey"; that all of Pepper's work had been done in New York; that "(n)o soliciting was done in New Jersey, no contract entered into in that state, McGee v. International Life Ins. Co., 355 U.S. 220 (78 S.Ct. 199, 2 L.Ed.2d 223) (1957), no acts committed there by Pepper that could be characterized as purposeful efforts indicating an intention to avail himself of the privilege of conducting business in that State, thus invoking the benefits and protections of its laws. International Shoe Co. v. Washington, 326 U.S. 310, 319 (66 S.Ct. 154, 90 L.Ed. 95) (1945)." Recognizing that "probate administration is a subject of special concern and regulation for the states, a condition which in some circumstances justifies exceptional extension of in personam jurisdiction," the judge thought that New Jersey could "protect that interest by regulating the disbursement of funds out of the estate, supervising the executor, and scrutinizing payments before they are made." Finally he suggested that the case was "within at least the penumbra of Hanson v. Denckla, 357 U.S. 235, 251-55 (78 S.Ct. 1228, 2 L.Ed.2d 1283) (1958), and the limits that case suggests upon the unquestionably long arms of the states."
 
 
 48
 We cannot agree. Under New Jersey law Pepper could receive payment for his services from the estate only by application to the probate court or by payments on account from the fiduciary "subject to approval and allowance or to disallowance by the court upon settlement of his (the fiduciary's) accounts." Having chosen the latter course, Pepper took it cum onere. We cannot see that anything turns on the point that, after DeWitt's death, the firm might not have been entitled to act for the estate in matters that involved the practice of law in New Jersey; N.J.C.P.R. 4:42-9(a)(2) applies to all payments for legal services out of a fund in court, whether to New Jersey lawyers or otherwise. While New Jersey might have followed the district judge's suggested course of scrutinizing all payments from estates to lawyers before they were made, its powers over such fees should not be lessened because it allowed the alternative, more favorable to lawyers, of permitting payment on account subject to subsequent scrutiny. It is not of much importance for this case whether jurisdiction be sustained on the basis that any lawyer receiving a payment on account from a New Jersey estate consents to the exercise of the court's power to disallow the payment upon settlement of the fiduciary's account, or upon the New Jersey long arm rule, N.J.C.P.R. 4:4-4(e), and the principle of McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), see Restatement Second of the Conflict of Laws § 36(2) and comment e at pp. 149-52 (1969); Note, Attorneys: Interstate and Federal Practice, 80 Harv.L.Rev. 1711, 1715 (1967), or on both. The payments were received out of a New Jersey estate, for services to that estate, and were expressly subject to New Jersey's power to direct repayment. We discern no penumbra of Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), that forbids the exercise of jurisdiction under these circumstances. In that case Florida was endeavoring to exercise personal jurisdiction over the Delaware trustee of a trust executed in Delaware by a resident of Pennsylvania; the only contacts with Florida were that the settlor later moved there and died there and that the Delaware fiduciary had carried out some acts of trust administration requested by the settlor during her Florida residence.
 
 
 49
 Mere statement is enough to show that there is nothing unfair in requiring an out-of-state lawyer who has received payment on account from a New Jersey estate subject to subsequent review by a New Jersey court to respond to the court's request for such review. Unfairness inconsistent with notions of fair play occurs only when a defendant is "compelled to defend himself in a court of a State with which he has no relevant connection." D. Currie, The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois, 1963 Ill.L.F. 533, 534. What the proper result should be if the estate had once been settled and the beneficiaries sought to relitigate the propriety of the payments, assuming that such a suit would not be barred by res judicata, is another matter, upon which we are not required to pass. The district court was thus in error in refusing to enforce the New Jersey judgment and we direct that it do so. However, although Pepper was the victim of his own recalcitrance in not appearing on the return date,[7] his action was not altogether without basis, as witness the sanction bestowed upon it by an able district judge, and we are troubled by our belief that he indeed rendered valuable services to the estate and should not be deprived of payment because of his alleged derelictions on unrelated matters, for which other remedies exist, without a court having passed on the merits of his claim. The district court shall therefore stay execution of its judgment enforcing the New Jersey judgment against Pepper for sixty days, and if within that period Pepper moves, with appropriate papers, the New Jersey court to vacate its judgment, see fn. 6 supra, and reconsider the propriety of the payments to him, until the New Jersey court has passed upon said motion.
 
 
 50
 Judgment in accordance with the foregoing. No costs.
 
 
 
 [1]
 1. That heretofore Pepper has claimed approximately $116,000 in legal fees and disbursements against the Stockholders and the Corporation for which he has impressed a lien
 
 
 [2]
 The Stockholders and the corporation have heretofore denied the validity of the said Pepper claim and lein (sic )
 
 
 [3]
 There is a proceeding now pending in the Supreme Court, New York County under Index # 8982/68 to require the said Pepper to deliver up the said Stock Certificates, books and papers upon which he has claimed a lien and the parties hereto now desire to adjust their differences
 
 
 [4]
 Accordingly, the parties hereto agree that there shall be paid to Pepper, in full satisfaction of all claims for services rendered to the Stockholders and the Corporation, the sum of $75,000. The said sum is to be paid by the Stockholders to Sidney Pepper only pursuant to the executed assignment attached hereto and made a part hereof
 
 
 [5]
 Upon receipt of the said $75,000, Pepper shall have no further claim of any kind or type against any of the Stockholders or the Corporation and the Stockholders on one hand and Pepper on the other hand shall fortwith (sic ) exchange general releases, releasing each other, except for any promisory (sic ) notes executed by Miriam J. Pepper, John J. Lipsky and any collateral security for said notes and, in addition, Pepper agrees to execute and deliver a general release to Modern Talking Picture Service, Inc
 
 
 [6]
 The Stockholders also warrant and represent that they are executing this agreement and the assignment of the $75,000 of proceeds of their own free will in the presence of each other and Attorney, William E. Kelly, Esq., who is present at the execution of this agreement
 
 
 [7]
 In the event the Sherman Unger Group do not purchase the corporate stock of the Stockholders on or before June 24, 1968, then it is hereby agreed that the Stockholders and the Corporation, individually and jointly shall restore said Pepper to the same position he held prior thereto and shall cause themselves and the Corporation to return the stock and papers which he has this date delivered to them, so as to reinstate his lien
 
 
 [8]
 Pepper agrees to cause Edmund H. Cox to deliver a written resignation as Director of Modern Talking Picture Service, Inc. to said Corporation on or before June 14, 1968
 
 
 [2]
 For the stockholders successfully to attack the settlement contract on the ground that it was obtained through unlawful duress of property, they must prove at trial that Pepper had no right to legal fees in connection with the Sonderling deal and that he refused to relinquish Modern's papers except on compliance with his unlawful demand for payment of such fees. In addition, they must prove that further resort to legal remedies would have been impracticable or futile in the circumstances and that as a practical matter there was no other means of immediate relief available to them (such as another postponement of the closing). Otherwise the stockholders, represented by competent and knowledgeable counsel, who negotiated a compromise agreement stating that Pepper had performed legal services and warranting that the stockholders signed "of their own free will," would not demonstrate the element of compulsion necessary to a finding of duress. (Footnotes omitted)
 Judge Mulligan, concurring, thought the stockholders' burden was even heavier than indicated by the majority and expressed concern that, in view of the stockholders' almost immediate repudiation of the compromise agreement, this may have been "simply a charade, that it was not the product of duress but constituted a fraud upon Pepper." 454 F.2d at 637.
 See also International Halliwell Mines, Limited v. Continental Copper & Steel Industries, Inc., 544 F.2d 105, 108 (2 Cir. 1976).
 
 
 [3]
 From September 27, 1967 to November 22, 1967, for example, Pepper handled preliminary talks with Bell & Howell about a possible sale or merger, an inquiry which was originally referred to Pepper by Carl Lenz. Arlinghaus exhibit 23, Joint Appendix 507a-525a. Mrs. Arlinghaus gave authorization for Pepper to seek an acceptable deal for her interest in the company at the "Baltusrol luncheon" of December 20, 1967. Pepper deposition at 199-203
 The district court thought Pepper's testimony concerning the starting date of his efforts to make a deal was contradictory. District Court opinion, at footnote 1. However, the documentary evidence makes clear that Pepper's authorization from Carl Lenz to conduct discussions dated at least from September 1967. Management's interest in a deal wavered in November 1967 (Joint Appendix 525a), but discussions involving both shareholders and management began again in early 1968 (Joint Appendix 540a-543a).
 
 
 [4]
 One can view Pepper's entitlement to some compensation as arising from a claim for quantum meruit, or from an implied-in-fact agreement by the management and controlling stockholders of Modern that his services fell outside the retainer. See 3A Corbin on Contracts § 648, at 108 (1960): "(I)f B has received and is actually profiting by a performance of value that A has rendered, a restitutionary remedy is available to A, even though he has not fulfilled a condition precedent to B's promissory duty to pay. Although A cannot enforce B's express promise, he can get a judgment for the reasonable value of the performance that B has received from him and retained."; 1 id. § 75, at 321: "Frequently, services are rendered under circumstances such that the party benefited thereby knows the terms on which they are being offered. If he receives the benefit of the services in silence, when he had a reasonable opportunity to express his rejection of the offer, he is assenting to the terms proposed and thus accepts the offer." (Footnote omitted). Cf. 3A id. § 756, at 505-06; Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 387-88, 122 N.E. 378, 381 (1919) (Cardozo, J.)
 
 
 [5]
 The added $16,000 figure may have been more reasonable, although Pepper seems not to have explained it at the time. Pepper testified at trial that this represented the amount due him under the remainder of the current retainer contract (the retainer was automatically renewed for the next fiscal year each April 1 unless notice of nonrenewal was given); the amount he thought might have been unpaid under the previous year's retainer; fees for his attendance as a witness at the Delaware Chancery proceedings; and about $1,000 in disbursements
 
 
 [6]
 The court also entered judgment against Mrs. DeWitt for $15,000 plus interest but, apparently because she had appeared at the hearing, allowed her to file affidavits and to move to vacate the judgment
 
 
 [7]
 The New Jersey court also expressed dissatisfaction with Pepper's affidavit but did not specify the reason for this